[Cite as *State v. Harrison*, 2022-Ohio-2537.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## LOGAN COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,                   CASE NO. 8-22-05

    v.

KANDALE L. HARRISON,

                                        O P I N I O N

    DEFENDANT-APPELLANT.

---

Appeal from Logan County Common Pleas Court
Trial Court No. CR 20 12 0290

Judgment Affirmed

Date of Decision: July 25, 2022

---

APPEARANCES:

    *Kenneth J. Rexford* for Appellant

    *Eric C. Stewart* for Appellee

**WILLAMOWSKI, J.**

{¶1} Defendant-appellant Kandale L. Harrison ("Harrison") brings this appeal from the judgment of the Court of Common Pleas of Logan County finding him guilty of one count of aggravated possession of drugs with a firearm specification and a major drug offender specification and one count of failure to comply with an order or signal of a police officer. On appeal, Harrison challenges 1) the denial of his motion to suppress, 2) the failure to dismiss the firearm specification, and 3) the imposition of an indeterminate sentence. For the reasons set forth below, the judgment is affirmed.

{¶2} On November 3, 2020, Deputy Coleton Piatt ("Piatt") of the Logan County Sheriff's Office was watching traffic on US 68 from a parking lot. Doc. 19. Piatt saw a car pass his car and aggressively brake for no observable reason. Doc. 19. Piatt then pulled out and followed the car as it turned down Tanglewood Drive. Doc. 19. The car quickly turned into a driveway and turned off its lights. Doc. 19. A couple minutes later, the car turned back on its lights and resumed traveling on US 68. Doc. 19. Piatt then initiated an investigatory stop near Tracemore Lane. Doc. 19. The car was slow to stop, turned on its hazard lights, and continued slowly moving. Doc. 19. The vehicle eventually stopped and Piatt asked Harrison to step out of the vehicle. Doc. 19. Harrison opened the door to the car, but refused to exit the car. Doc. 19. Piatt warned Harrison that if he did not get out of the car, he

would release the canine. Doc. 19. Harrison replied that he did not feel safe, closed his door and drove northbound at 55-60 mph with his hazard lights on. Doc. 19. For 39 minutes, Harrison continued to evade Piatt and officers from multiple other agencies. Doc. 19. During the pursuit, Harrison ran multiple stop signs, exceeded the speed limit, attempted to pass a police cruiser in front of him by crossing a double yellow line, and narrowly missed hitting oncoming vehicles. Doc. 19. At times, Harrison's speed reached 90 mph on single lane roads. Doc. 19. The Champaign County Sheriff's Office deployed stop sticks, flattening both driver side tires. Doc. 19. Harrison continued to drive on the rims until Piatt struck Harrison's vehicle several times, causing Harrison to lose control of the vehicle and stop. Doc. 19. Upon securing Harrison, they searched him and found a plastic container containing .21grams of cocaine. Doc. 19.

{¶3} Additionally, during the chase, Piatt saw Harrison throw an object out of the window at the intersection of US 68 and SR 507. Doc. 19. Officers recovered a Ruger P89 handgun from this location. Piatt also saw Harrison throw an object out of the window near the corner of US 68 and Sidney Street in West Liberty. Doc. 19. Officers recovered a bag with a large amount of methamphetamine at that location. A third item was tossed from the window near an alley intersecting with Reynolds Street in West Liberty. Officers recovered a second bag with methamphetamines at that location. Piatt's dash camera recorded all of these objects

being tossed from the car. Doc. 19. After Harrison was arrested, the vehicle was towed to the Logan County Impound. Doc. 19. A search warrant was obtained and more methamphetamines were found in the vehicle. Doc. 19.

{¶4} On December 8, 2020, the Logan County Grand Jury indicted Harrison on the following counts: 1) Aggravated Possession of Drugs in violation of R.C. 2925.11(A), (C)(1)(e), a felony of the first degree; 2) Possession of Cocaine in violation of R.C. 2925.11(A), (C)(4)(a), a felony of the fifth degree; 3) Failure to Comply with an Order or Signal of a Police Officer in violation of R.C. 2921.331(B), (C)(5)(a)(ii), a felony of the third degree; 4) Having Weapons While Under Disability in violation of R.C. 2923.13(A)(3), (B), a felony of the third degree; and 5) Tampering with Evidence in violation of R.C. 2921.12(A)(1), (B), a felony of the third degree. Doc. 2. Count 1 included a firearm specification and a major drug offender specification ("MDO"). Doc. 2. Harrison entered pleas of not guilty to all counts. Doc. 9.

{¶5} On April 7, 2021, Harrison filed a motion to suppress claiming the initial stop was not based upon a reasonable, articulable suspicion. Doc. 46. On July 21, 2021, Harrison filed a motion to dismiss the firearm specification alleging that it violated his Second Amendment rights under the U.S. Constitution. A new motion to suppress was filed by Harrison's new attorney on August 2, 2021. Doc. 74. A hearing on all outstanding motions was held on August 25, 2021. Doc. 81.

On September 16, 2021, the trial court denied the motion to dismiss the firearm specification and the motion to suppress. Doc. 92-93

{¶6} On December 13, 2021, a final pretrial was held. Doc. 157. Pursuant to a plea agreement, Harrison agreed to enter pleas of no contest Count 1-Aggravated Possession of Drugs along with the firearm specification and the major drug offender specification and Count 3-Failure to Comply. The State agreed in exchange to dismiss Counts 2, 4, and 5. Doc. 157. After conducting a dialogue with Harrison, the trial court accepted the no contest plea and found Harrison guilty of Counts 1 and 3 along with the two specifications. Doc. 157. The remaining counts were dismissed. Doc. 157. A sentencing hearing was held on January 11, 2022. Doc. 165. The trial court ordered a prison term of 11 to 16 ½ years on Count 1, with one more year added for the firearm specification. Doc. 165. The trial court ordered a prison term of three years for Count 3 and ordered that all terms be served consecutively for an aggregate sentence of 15-20½ years in prison. Harrison appealed from this judgment. Doc. 180. On appeal Harrison raises the following assignments of error.

**First Assignment of Error**

**The trial court erred in denying the defense motion to suppress.**

**Second Assignment of Error**

**The trial court erred by not dismissing the unconstitutional firearm specification.**

**Third Assignment of Error**

**The trial court erred by imposing an indeterminate sentence as to Count 1.**

*Motion to Suppress*

{¶7} Harrison claims in his first assignment of error that the trial court erred in denying his motion to suppress. The basis for the argument is that the initial traffic stop was not based upon reasonable, articulable suspicion.

> **An appellate review of the trial court's decision on a motion to suppress involves a mixed question of law and fact. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8; *State v. Norman*, 136 Ohio App.3d 46, 51, 735 N.E.2d 953 (3d Dist.1999). We will accept the trial court's factual findings if they are supported by competent, credible evidence, because the "evaluation of evidence and the credibility of witnesses" at the suppression hearing are issues for the trier of fact. *State v. Mills*, 62 Ohio St.3d 357, 366, 582 N.E.2d 972 (1992); *Norman* at 51, 735 N.E.2d 953; *Burnside* at ¶ 8. But we must independently determine, without deference to the trial court, whether these factual findings satisfy the legal standard as a matter of law because "the application of the law to the trial court's findings of fact is subject to a de novo standard of review." *Norman* at 52, 735 N.E.2d 953; *Burnside* at ¶ 8.**

*State v. Urdiales*, 3d Dist. Henry No. 7-15-03, 2015-Ohio-3632, ¶ 12, 38 N.E.3d 907.

{¶8} A "police stop of a motor vehicle and the resulting detention of its occupants has been held to be a seizure under the Fourth Amendment." *State v. Kerr*, 3d Dist. Allen No. 1-17-01, 2017-Ohio-8516, ¶ 13. "Under the Fourth

Amendment, the level of intrusiveness involved in a traffic stop must be objectively justified by a reasonable, articulable, and particularized suspicion that criminal activity is afoot." *Id*. at ¶ 14. Reasonable, articulable suspicion has been defined as "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion [upon an individual's freedom of movement]." *Id*. at ¶ 15. The reasonable suspicion must be something more than a "hunch", but need not rise to the level of suspicion required for probable cause. *State v. Ramos*, 155 Ohio App.3d 396, 2003-Ohio-6535, 801 N.E.2d 523. Whether there is reasonable, articulable suspicion must be viewed through the totality of the circumstances and "viewed through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold." *Kerr*, *supra* at ¶ 16 quoting *State v. Andrews*, 57 Ohio St.3d 86, 88-89, 565 N.E.2d 1271 (1991).

{¶9} At the suppression hearing, Piatt testified that on the night of the stop, he was parked observing traffic passing on US 68. Tr. 131. He observed a 2020 black Nissan pass the patrol car travelling north. Tr. 131. For no known reason, the driver of the car "slammed" on his brakes. Tr. 131. Piatt then pulled out following the car. Tr. 131. The driver then immediately turned left into a housing development on Tanglewood Drive. Tr. 131. The driver then turned into the first driveway, turned off the car's lights and pulled up by the residence. Tr. 132. Piatt then went on past the driveway, around a loop, then pulled over and turned off all

his lights. Tr. 133. After about two minutes, Piatt turned on his headlights and then went back by the house to see that the car was gone. Tr. 133. Piatt then saw the car going back north on US 68. Tr. 134. Piatt then started following the vehicle and initiated a traffic stop of the car. Tr. 134. When the car had previously turned into the drive, Piatt ran the license to find out it was registered to a rental company. Tr. 134-35. Piatt testified that he is part of the drug interdiction team and that there is a significant amount of drug trafficking in the area. Tr. 135.

{¶10} As Piatt was pulling up behind the vehicle, he observed the driver making unnecessary movements such as bending down and reaching into the glove compartment. Tr. 135. Piatt testified that he did not feel safe approaching the vehicle and requested the driver to exit the vehicle with his hands visible. Tr. 135. The driver asked Piatt what law he had violated and Piatt informed him that no laws had been violated, but his behavior was suspicious. Tr. 136. Despite numerous orders to step out of the vehicle, the driver did not do so. Tr. 136. Piatt then told the driver that if he did not get out of the car, he would release the canine. Tr. 136. The driver then told Piatt that he did not feel safe and left the traffic stop. Tr. 136. Piatt then got back in his cruiser and followed the driver. Tr. 136.

{¶11} Piatt's dash camera commenced recording prior to the stop of the vehicle and the recording was admitted as State's Ex. 4-C at the suppression hearing. Tr. 137. When the driver left, he told Piatt to follow him to a "safe location". Tr.

139. Piatt followed the driver off US 68 and turn east onto Guntown where there is a Walmart. Tr. 139. The driver continued past the Walmart parking lot to County Road 1 where he turned right. Tr. 139. He then continued on that road all the way to SR 507 in Champaign County where the driver then turned right. Tr. 139. The driver then took SR 507 all the way back to US 68 south of West Liberty. Tr. 139-40. During this time additional deputies along with the West Liberty police were called to assist and numerous attempts were made to stop the vehicle. Tr. 140. Piatt had no knowledge of who the driver of the vehicle was at this time. Tr. 140.

{¶12} When the driver reached US 68, he made another right turn to go north on that road. Tr. 142. Piatt saw him toss a black object out of the window. Tr. 142. The driver continued into the village of West Liberty. Tr. 142. When the driver reached Sidney Road, he turned left. Tr. 143. Piatt observed the driver throw something from the driver's window which landed in a grassy area and he notified others to check that area. Tr. 143. While going through West Liberty, the driver failed to stop at multiple stop signs. Tr. 143. At one point, the driver bumped into a West Liberty patrol car. Tr. 144. Piatt then saw the driver toss another bag at the base of an evergreen tree near an alley that he asked be checked by officers. Tr. 145. Eventually Piatt begins bumping the car he is following in an attempt to get him to stop. Tr. 145. Champaign County Sheriff's Office deployed stop sticks, which flattened the tires on the driver's side of the Nissan. Tr. 146. The driver

continued to try to elude them by driving on the rims. Tr. 146-47. At the intersection of SR 296 and SR 814, Champaign County deputies joined the pursuit and attempted to box him in. Tr. 147. The driver went around their patrol cars. Tr. 147. The driver then turned north onto SR 814 and Piatt made contact with his vehicle a couple of times before the driver lost control and the chase ended. Tr. 147.

{¶13} At that time, the driver exited the vehicle and the canine was dispatched to prevent him from running away. Tr. 147-48. Piatt ordered the driver to get on the ground but he refused to comply. Tr. 148. The canine engaged the driver and a couple of Champaign County sheriff's deputies were able to take him to the ground and apply handcuffs. Tr. 148. Champaign County deputies then searched his person. Tr. 148. The search turned up a baggie of white powdery substance in his pocket. Tr. 149. The driver was placed in the patrol car and the car was towed to the impound lot. Tr. 149. The next morning officers recovered items they believed to have been tossed by Harrison at the locations where he was observed tossing items. Tr. 150. A search warrant was obtained to search the vehicle. Tr. 150. Inside the vehicle the police found more drugs and drug paraphernalia. Tr. 152.

{¶14} On cross-examination, Piatt admitted that the slamming on the brakes for no visible reason was enough to raise his curiosity. Tr. 160. Piatt also admitted that he had not observed any criminal behavior, just a suspicion that the driver was

being evasive. Tr. 161-62. The neighborhood into which the driver turned is not known as a high crime area and is "very ritzy". Tr. 163.

**{¶15}** The first question before this court is whether the officer had a reasonable, articulable suspicion to justify the initial stop. A person is "seized" within the meaning of the Fourth Amendment "only when, by means of physical force or a show of authority, his freedom of movement is restrained." *United States v. Mendenhall,* 446 U.S. 544, 553, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). "Absent the use of physical force, a seizure requires both a 'show of authority' from law enforcement and 'submission to [that] assertion of authority" by the person at whom it is directed." *United States v. Garrette*, N.D.Florida No. 3:17cr022/MCR, 2017 WL 3337258, *2 (Aug. 4, 2017). Submission requires that the person comply with the directives of law enforcement. *Id.* The failure to submit to the instructions means there is no seizure, merely an attempted seizure which is beyond the scope of the Fourth Amendment. *Brendlin v. California*, 551 U.S. 249, 2545, 127 S.Ct. 2400, 168 L.Ed.2d 132 (2007). *See also Wilson v. Northcutt*, 987 F.2d 719 (11th Cir. 1993) (holding that a defendant who had locked herself in a bathroom and did not come out when commanded to do so by the police was not submitting to the show of authority and was thus not seized for Fourth Amendment purposes).

**{¶16}** Generally, the driver of a vehicle submits to the officer's show of authority by pulling over and awaiting the arrival of a police officer, thus being

deemed to be seized when the driver pulls to a stop. *Brendlin, supra* at 263. "However, in cases where a driver resumes driving or otherwise retreats either immediately or shortly after bringing his car to a halt, courts have consistently held that the driver's temporary halt in movement does not constitute acquiescence to police authority." *Garrette, supra* at *2. Numerous other courts have held that submission to the show of authority is required for the seizure to occur. *See United States v. Seymour*, 739 F.3d 923 (6th Cir. 2014) (holding that defendant was not seized when he failed to submit to police authority when he stopped the car, but then got out and started running); *United States v. Salazar,* 609 F.3d 1059 (10th Cir. 2010) (driver only submits to police authority when he complies with officer's command to park and exit the truck); *United States v. Baldwin*, 496 F.3d 215 (2d Cir. 2007) (driver who pulled over, but sped away when officers approached the vehicle did not submit and was thus not seized); *United States v. Huertas*, 864 F.3d 214 (2d Cir. 2017) (defendant failed to submit to the police show of authority when he answered officer's questions for 30-60 seconds, but then fled when officer exited the patrol car); and *United States v. Valentine*, 232 F.3d 350 (3d Cir. 2000) (suspect fails to submit to show of authority for purposes of seizure when pauses, gives name when asked, then runs away). In other words, to actually be seized pursuant to the Fourth Amendment, a person must do more than temporarily stop. The person must comply with the instructions of the officer.

{¶17} Here, Harrison briefly complied with the officer's show of authority by stopping the vehicle when he saw the lights and heard the siren. However, that was where his submission ended. When commanded to exit the vehicle, he refused. Then he drove off, allegedly to find a safer place to pull over. Harrison did not stop again for approximately 40 minutes and only stopped then when he lost control of the vehicle. Thus, it is clear that the initial stop was nothing more than a temporary stop and that Harrison never fully submitted to the show of authority. As a result, he was not "seized" for the purposes of the Fourth Amendment.

{¶18} Once Harrison took off, leading Piatt and other officers on a long chase over two counties, multiple violations occurred. Harrison first failed to comply with the command of the officers to pull over during the chase. Piatt testified that Harrison failed to comply with stop signs on multiple occasions, attempted to pass in an area marked with a double yellow line, and bumped into a West Liberty patrol car without stopping. Piatt also observed him tossing various items from the vehicle during the chase. Once Harrison's vehicle was stopped, Harrison got out of the car and refused to get down on the ground requiring the canine unit to hold him and two officers to forcefully put him on the ground. All of this activity provided not only reasonable, articulable suspicion for the subsequent stop, but also probable cause to search his person. The search of the car was done pursuant to a warrant and no claim that the warrant was not supported by probable cause has been made. The

gun and the drugs, which were found alongside the road, were found in the location that Piatt testified seeing Harrison toss items from the window of the car. By tossing the items from the vehicle, Harrison lost his expectation of privacy in the items, so there is nothing to prohibit the police from picking them up from where he tossed them. *See United States v. Dillard*, 6th Cir. No. 01-3743, 2003 WL 22400724. The trial court did not err in overruling Harrison's motion to suppress. Thus, the first assignment of error is overruled.

*Constitutionality of R.C. 2941.141.*

{¶19} Harrison claims in the second assignment of error that the trial court erred by not dismissing the firearms specification. Harrison alleges that R.C. 2941.141 is unconstitutional as it violates his Second Amendment right to bear arms as it was only the fact that he had the firearm in his possession at the time of the stop, not that he brandished it in any way or used it to facilitate the offense. "A regularly enacted statute of Ohio is presumed to be constitutional and is therefore entitled to the benefit of every presumption in favor of its constitutionality." *State ex rel. Dickman v. Defenbacher*, 164 Ohio St. 142, 147, 128 N.E.2d 59 (1955). The issue of the constitutionality of R.C. 2941.141 was addressed by the 12th District Court of Appeals of Ohio in *State v. Isreal*. 12th Dist. Warren No. CA2011-11-115, 2012-Ohio-4876 (overruled on other grounds by *State v. Beatty*, 12th Dist. Clermont No. CA2021-10-057, 2022-Ohio-2329). In *Isreal*, the defendant challenged the

constitutionality of R.C. 2941.141, claiming that punishing him for merely possessing a firearm during the commission of the crime, but without using it violated his Second Amendment right to bear arms. The Court determined that it did not violate the defendant's Second Amendment rights and determined the statute to be constitutional.

> **The Ohio Supreme Court has not been asked to determine the constitutionality of imposing sentences for firearm specifications. However, it is well-settled that the right to bear arms is not absolute and is instead subject to the reasonable regulation pursuant to the state's police power.** *Arnold v City of Cleveland*, **67 Ohio St.3d 35 (1993);** *District of Columbia v. Heller*, **554 U.S. 570, 128 S.Ct. 2783 (2008). Additionally, federal courts have held that federal firearm enhancements, which are the equivalent to firearm specifications, do not run afoul of the Second Amendment.** *United States v. Goodlow,* **389 Fed.App. 961 (11th Cir.2010);** *United States v. Jacobson*, **406 Fed.Appx. 91 (8th Cir.2011);** *Benson v. United States*, **W.D. Mich. No. 1:11-CV-368, 2011 WL 6009961 (Dec. 1, 2011). We agree with the reasoning of these courts and find that R.C. 2941.141 is constitutional.**

*Id.* at ¶ 97.

Based upon the logic in *Isreal*, we find that the trial court did not err in denying the motion to dismiss the firearm specification. The second assignment of error is overruled.

*Imposition of an Indefinite Sentence*

{¶20} Harrison makes two argument in his third assignment of error. The first is that the Reagan Tokes Law does not apply to an MDO case. Pursuant to the Reagan Tokes Law, the trial court, when sentencing a defendant on a first degree

felony, determines the maximum prison term by using the minimum term and adding fifty percent of the minimum term. R.C. 2929.144(B)(1-2). However, the trial court may not consider any additional time imposed due to a conviction of a specification when calculating what the maximum sentence will be. R.C. 2929.144(B)(4).

{¶21} Harrison argues that since a MDO specification sets the sentence to be imposed at 11 years, the trial court lacks the authority to impose a different sentence under the Reagan Tokes Law. However, the specification does not set the time at a certain amount. Instead, a MDO can be specified when the amount of the drug involved equals or exceeds 100 times the bulk amount. R.C. 2925.11(C)(1)(e). If this specification exists, the trial court must impose the maximum sentence for a first degree felony. R.C. 2925.11. The maximum sentence for a first degree felony is eleven years. R.C. 2929.14(A)(1)(a). Thus, it does not add to the sentence of the underlying offense, it merely takes away the trial court's discretion to impose a sentence other than the maximum for the underlying offense.

{¶22} Here, Harrison was convicted of a first degree felony – Aggravated Possession of Drugs – with an MDO specification that would mandate that the sentence imposed be the maximum.

> **(1)(a) For a felony of the first degree committed on or after the effective date of this amendment, the prison term shall be an**

> **indefinite prison term with a stated minimum term selected by the court of three, four, five, six, seven, eight, nine, ten, or eleven years and a maximum term that is determined pursuant to section 2929.144 of the Revised Code,** *except that if the section that criminalizes the conduct constituting the felony specifies a different minimum term or penalty for the offense, the specific language of that section shall control in determining the minimum term or otherwise sentencing the offender but the minimum term or sentence imposed under that specific language shall be considered for purposes of the Revised Code as if it had been imposed under this division.*

R.C. 2929.14(A). Thus, pursuant to the statute, the sentence of 11 years is the minimum for the application of the Reagan Tokes Law. Since an MDO specification does not add to the minimum sentence used to calculate the maximum, there is no statutory prohibition to applying the Reagan Tokes Law to a sentence with an MDO specification.

{¶23} The second argument is that the Reagan Tokes Law is unconstitutional as applied as it violates his right to trial by jury, double jeopardy, and the separation of power. In the past, we have held that certain as applied challenges to Reagan Tokes were not ripe for review. *See*, *e.g.*, *State v. Kepling*, 3d Dist. Hancock No. 5-20-23, 2020-Ohio-6888, ¶ 11. However, the Supreme Court of Ohio recently released *State v. Maddox*, --- Ohio St.3d ---, 2022-Ohio-764, and determined that constitutional challenges to Reagan Tokes are ripe for review. Based on the holding in *Maddox*, we will address the constitutional issues raised regarding the application of Reagan Tokes.

-17-

{¶24} In reviewing the matter, we emphasize that statutes are presumed constitutional, and it is Appellant's burden to demonstrate that the statute at issue is unconstitutional. *State v. Thompkins*, 75 Ohio St.3d 558, 1996-Ohio-264. Appellant has presented no compelling authority undermining the constitutionality of Reagan Tokes.

{¶25} Notwithstanding this point, numerous Ohio Appellate Courts have already rejected challenges similar to Appellant's. *State v. Rogers*, 12th Dist. Butler No. CA2021-02-010, 2021-Ohio-3282, ¶ 18 (holding that the statute does not violate due process protections or separation of powers doctrine); *State v. Thompson*, 2d Dist. Clark No. 2020-CA-60, 2021-Ohio-4027, ¶ 25 (holding that the statute does not violate the right to a trial by jury or separation of powers doctrine); *State v. Delvallie*, 8th Dist. Cuyahoga No. 109315, 2022-Ohio-470, ¶ 46, 185 N.E.3d 536 (en banc) (holding that the statute does not violate the right to trial by jury, due process requirements, or the separation of power doctrines). We agree with the reasoning expressed by the other Ohio Appellate Courts cited herein and determine that Appellant's "as applied" challenge in this case is unavailing. Additionally, application of the Reagan Tokes law does not constitute double jeopardy under the law. Double jeopardy prohibits one from being retried for the same offense. *State v. Mutter*, 150 Ohio St.3d 429, 2017-Ohio-2928, 82 N.E.3d 1141. The decision whether an inmate serves more than the minimum sentence is

not a retrial of the original offense, but is based upon subsequent behavior. The sentence may not be extended more than the maximum sentence originally imposed by the trial court. Thus the double jeopardy clause of the constitution is not implicated in this matter. The third assignment of error is overruled.

{¶26} Having found no error in the particulars assigned and argued, the judgment of the Court of Common Pleas of Logan County is affirmed.

***Judgment Affirmed***

**ZIMMERMAN, P.J. and MILLER, J., concur.**

**/hls**